746 So.2d 966 (1999)
ARCHER DANIELS MIDLAND COMPANY et al.
v.
SEVEN UP BOTTLING COMPANY OF JASPER, INC.
1960220.
Supreme Court of Alabama.
June 25, 1999.
Rehearing Denied October 22, 1999.
*967 Vernon L. Wells and Julia Boaz-Cooper of Walston, Wells, Anderson & Bains, L.L.P., Birmingham; L. Vastine Stabler, Jr., Birmingham, and Aubrey M. Daniel III and John Schmidtlein of Williams & Connolly, Washington, DC, "of counsel," for appellant Archer Daniels Midland Co.
Robert D. Eckinger and E. Berton Spence of Lange, Simpson, Robinson & Somerville, Birmingham, for appellant Haarmann & Reimer Corp.
James L. North of James L. North & Associates, Birmingham, for appellant Cargill, Inc.
Garve Ivey, Jr., of King & Ivey, Jasper; Philippa McC. Bainbridge and Michael Straus of Bainbridge & Straus, Birmingham; J. Michael Rediker, Thomas L. Krebs, and Steve P. Gregory of Ritchie & Rediker, Birmingham; Larry W. Morris and Randall S. Haynes of Morris, Haynes, Ingram & Hornsby, Alexander City; and Herman Watson, Jr., and Douglas C. Adair of Watson, Fees & Jimmerson, Huntsville, for appellee.
PER CURIAM.
The issue presented on this appeal is whether Ala.Code 1975, § 6-5-60, provides a cause of action for damage alleged to have resulted from a conspiracy to control the price of citric acid that was shipped from companies out-of-state into Alabama. The trial court ruled that § 6-5-60 provides such a cause of action; therefore, it denied the defendants' Rule 12(b)(6), Ala. R.Civ.P., motion to dismiss. We granted the defendants' request for permission to appeal that interlocutory order. Rule 5, Ala.R.App.P. We reverse and remand.
The plaintiff, Seven Up Bottling Company of Jasper, Inc. ("Seven Up"), filed this action on behalf of itself and seeking to represent a class consisting of "[a]ll persons or entities within Alabama who purchased citric acid and/or products containing citric acid indirectly from any of the Defendants or their co-conspirators at any time during the period January 1, 1991, to the present." Seven Up is an Alabama corporation engaged in the business of bottling and distributing soft drinks. Seven Up uses citric acid in its bottling operation. The defendants, Archer Daniels Midland Company; Cargill, Inc.; and Haarmann & Reimer Corporation, are in the business of selling citric acid. The complaint alleges that each of the defendants is a foreign corporation with its principal place of business outside Alabama. The complaint also alleges that the defendants engaged in a conspiracy to control the price of citric acid shipped into Alabama. The complaint further alleges that the plaintiff and others were injured as a result of that conspiracy by paying more for citric acid and for products containing citric acid than they would have paid if the price of citric acid had been set by free competition. In its order denying the defendants' motion to *968 dismiss, the trial court stated that "[t]he dispositive legal issue, as advanced by the Defendants, is whether [Ala.Code 1975, § 6-5-60], has application to such a conspiracy which, if conducted at all, is admittedly conducted in interstate commerce rather than in intrastate commerce."
Citing, among other cases, Georgia Fruit Exchange v. Turnipseed, 9 Ala.App. 123, 62 So. 542 (1913); Dothan Oil Mill Co. v. Espy, 220 Ala. 605, 127 So. 178 (1930); Ex parte Rice, 259 Ala. 570, 67 So.2d 825 (1953); San Ann Tobacco Co. v. Hamm, 283 Ala. 397, 217 So.2d 803 (1968); In re Brand Name Prescription Drugs Antitrust Litigation, 123 F.3d 599 (7th Cir.1997); In re NASDAQ Market Makers Antitrust Litigation, 929 F.Supp. 174, 179 (S.D.N.Y.1996); and Warren v. Playmobil U.S.A., Inc., [CV-95-B-1591-S, March 19, 1996] (N.D.Ala.1996), the defendants contend that Alabama's antitrust statutes have consistently been interpreted by state and federal courts to apply only to transactions involving intrastate commerce. The defendants argue that Alabama's antitrust statutes, including § 6-5-60, have the same field of operation today that they had when they were first enacted. According to the defendants, the legislative history of Alabama's antitrust statutes, as well as the state of federal caselaw at the time of their enactment, creates a presumption that the Legislature never intended to directly regulate agreements to control the price of goods shipped in interstate commerce. This presumption, the defendants argue, has not been overcome by the plaintiff.
The plaintiff contends that § 6-5-60 provides a cause of action in favor of "[a]ny person, firm, or corporation injured or damaged by an unlawful trust, combine or monopoly, or its effect, direct or indirect," and against "any person, firm, or corporation creating, operating, aiding, or abetting such trust, combine, or monopoly." According to the plaintiff, § 6-5-60 is clear on its face and should not be construed so narrowly as to limit its application to transactions involving intrastate commerce. The plaintiff maintains, in the alternative, that even if § 6-5-60 should be construed in light of the legislative history of Alabama's antitrust statutes and the state of federal caselaw at the time of their enactment, the clear intent of the Legislature in enacting § 6-5-60 was to regulate all agreements in restraint of trade, whether those agreements involved interstate commerce or intrastate commerce.
With the positions of the parties in mind, we pause to point out what this case is not about. We are not here concerned with whether the Legislature, based on the current state of federal caselaw, has the power to enact a statute, such as § 6-5-60, to provide a means of redress to Alabama companies for indirect injuries suffered as the result of agreements to control the price of goods shipped through interstate commerce. See California v. ARC America Corp., 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989), cited by the parties for the proposition that the Legislature now has that power.[1] This Court has held that an Alabama statute does not expand like an accordion with changes in federal law bearing on the Legislature's power. Instead, *969 we are concerned only with whether the Legislature, when it enacted § 6-5-60, contemplated that it would apply to such agreements. See In re Upshaw, 247 Ala. 221, 23 So.2d 861 (1945).
In determining whether § 6-5-60 provides a cause of action for damage resulting from an agreement to control the price of goods shipped through interstate commerce, we must follow the cardinal rule of statutory construction and ascertain and give effect to the intent of the Legislature in enacting the statute. If possible, legislative intent should be gathered from the language of the statute itself. John Deere Co. v. Gamble, 523 So.2d 95 (Ala.1988).
However, when circumstances surrounding the enactment of a statute cast doubt on the otherwise clear language of the statute, we must look to other factors in determining legislative intent. In Siegelman v. Chase Manhattan Bank (USA), N.A., 575 So.2d 1041 (Ala.1991), this Court was faced with the question whether the financial-institution excise tax, levied pursuant to Ala.Code 1975, § 40-16-1 et seq., applied to the credit-card business conducted by national banks located outside Alabama with Alabama residents. When that excise-tax statute was enacted in 1935, such taxation by the states was prohibited by federal statutes and caselaw. Federal law changed in 1976 so as to allow the taxation of national banks; the state argued that that change should render out-of-state national banks subject to the 1935 excise-tax statute. This Court rejected that argument, stating, at 575 So.2d at 1048-51:
"In the case presently before us, the trial court in its opinion stated that Ex parte Dixie Tool & Die Co., [537 So.2d 923 (Ala.1988)], controlled the resolution of the case:
"`In Dixie Tool & Die, as in the instant case, the issue was whether in originally enacting the statute, the legislature intended to tax transactions not previously taxed under that statute.
"`The Court holds that at the times[time] § 40-16-1 was enacted, the State was prohibited by federal statute from taxing out-of-state national banks. The National Bank Act expressly limited the state's authority to tax only those "national banking associations located within its limits." Because the federal statute was in force at the time § 40-16-1 was enacted, full knowledge and information as to the prior and existing law on the subject of this section [are] imputed to the legislature. A legislature is presumed to know the limit of its taxing power. Further, the statute will be interpreted on the assumption that the legislature was aware of existing statutes at the time new statutes are enacted.
"`Based on the foregoing, the Court finds that at the time § 40-16-1 was enacted the legislature could not have intended to impose a tax on out-of-state national banks.'
"In Dixie Tool & Die Co., the Alabama Department of Revenue assessed a sales tax against an Alabama corporation for sales made to out-of-state buyers and to federal government contractors. The Court in Dixie Tool & Die Co. considered whether sales made by the corporation to out-of-state purchasers were subject to Alabama's sales tax. The sales tax provision in question was Ala.Code 1975, § 40-23-4(a)(17). This code section provides:
"`(a) There are exempted from the provisions of this division and from the computation of the amount of the tax levied, assessed or payable under this division the following:
"`. . . .
"`(17) The gross proceeds of sales of tangible personal property or the gross receipts of any business which the state is prohibited from taxing under the Constitution *970 or laws of the United States or under the Constitution of this state.'
"In its opinion, the Court in Dixie Tool & Die Co. recognized that the United States Supreme Court allowed taxation of interstate commerce if the tax met certain criteria. However, the Court stated:
"`"[These] recent pronouncements of the United States Supreme Court which enlarge the permissible area of state taxation cannot change the intent or enlarge the scope of enactments passed by our Legislature. State v. Southern Electric Generating Co., 274 Ala. 668, 151 So.2d 216 (1963). Therefore, the question is not whether the State may, under prevailing caselaw, impose a tax upon the gross receipts earned from those transactions. Rather, the controlling issue is whether, in originally enacting this statute, the Legislature intended to tax these transactions."
"The provision that has become § 40-23-4(a)(17) was originally enacted in 1959. In 1959, and, indeed, until Complete Auto Transit [v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326] in 1977, the applicable case law held that a tax on the sale of goods in interstate commerce was invalid. The Legislature must be deemed to have been aware of the then-existing limits on a state's power to tax when it enacted the 1959 statute from which § 40-23-4(a)(17) derives. Thus, we must presume that the legislature knew, at the time the statute was passed, that the applicable case law would prevent the application of a sales tax to transactions in interstate commerce. The Legislature must also be presumed to be aware of the judicial enlargement of the State's permissible area and method of taxation, so it could have taken full advantage of those changes if it either intended or desired to do so. No changes have been made to § 40-23-4(a)(17). We conclude, therefore, that it applies today in the same manner that it did when enacted in 1959 and that it exempts sales of goods in interstate commerce from sales tax.'
"537 So.2d at 925 (quoting Ex parte Louisville & Nashville R.R., 398 So.2d 291, 293 (Ala.1981) (emphasis in [Louisville & Nashville])).
"The trial court also relied on Ex parte Louisville & Nashville R.R., supra. In Ex parte Louisville & Nashville R.R., the Court considered `whether Alabama's gross receipts tax upon a railroad's earnings from "intrastate business" applies to receipts generated by the L & N Railroad's movement of goods between two points in Alabama.' Id. at 292. The railroad gross receipts tax statute in question, Ala.Code 1975, § 40-21-57, provided:
"`In addition to all other taxes imposed by this title, there is hereby levied a license or privilege tax upon each person engaged in the business of operating a railroad in the state of Alabama for the privilege of engaging in such business; said license tax or privilege tax shall be ... in a sum equal to two and one-half percent of the gross receipts in excess of $150,000.00 of such railroad from all intrastate business of such railroad within the state of Alabama during the preceding year, the gross intrastate earning to be determined by the amount received from intrastate business.'
"The Court stated that the controlling issue in the case was whether in originally enacting the statute the legislature intended to tax these transactions:
"`The question before us is one of legislative intent. We presume that, in enacting the statute in 1935, the Legislature was aware of the existing interpretations and permissible limits of a state's power to tax. Thus, we presume our Legislature knew that at the time the statute was passed, the *971 rule in [Minnesota v.] Blasius, [290 U.S. 1, 54 S.Ct. 34, 78 L.Ed. 131 (1933),] would have prevented the application of the tax to transactions similar to those at issue because they constitute a portion of interstate commerce. We also presume that the Legislature was aware of the fact that this tax could not be sustained as one "in lieu of" other taxes because the tax was expressly levied "[i]n addition to all other taxes." Similarly, we presume that the Legislature was apprised of the fact that it could not justify this tax as one upon "local activity," because to do so would require the indulgence in the proscribed conceptual segmentation of the integral parts of an interstate transaction. Finally, we presume that the Legislature is aware of the judicial enlargement of the State's permissible area and method of taxation, so that the Legislature could have taken full advantage of those changes if it either intended or desired to. No such changes have been made during the forty-five years since the statute was passed and the State has not, by legislation, attempted to enlarge the scope of its taxation. Thus, viewed in its broadest scope, the statute in question could reach and impose a tax upon only those activities which were local and purely intrastate in character. We therefore conclude that the statute, as enacted in 1935 and as it exists today, was not intended to apply to receipts generated by transactions such as these which, although conducted wholly within the confines of Alabama, constitute an integral portion or segment of interstate commerce.'
"398 So.2d at 296-97. See also State v. Southern Elec. Generating Co., 274 Ala. 668, 151 So.2d 216 (1963).
"Like the question in Dixie Tool & Die Co. and Ex parte Louisville & Nashville R.R., the question before us is whether in originally enacting the Alabama Excise Tax Statute, the legislature intended to tax the net income derived by out-of-state national banks from solicitation of credit card applications from Alabama residents.
"In determining the intent of the legislature, we presume that in enacting the Excise Tax Statute the legislature was aware of existing prohibitions against the State's power to tax national banks. When the Excise Tax Statute was enacted in 1935, federal law and judicial interpretation prohibited states from taxing out-of-state national banks. It was not until the Congressional moratorium expired in 1976 that states were allowed to tax out-of-state national banks. Even after the expiration of the moratorium in 1976, the Alabama legislature failed to amend or to reenact the Excise Tax Statute in light of the federal change. See Freeman v. Jefferson County, 334 So.2d 902, 904 (Ala.1976) (`the rejection of an [a]mendment by the Congress which would have made the statute applicable to a given situation furnishes a strong inference that the statute was not intended to be applicable to that given situation'). Also, the Alabama legislature failed to amend or to reenact the Excise Tax Statute after the United States Supreme Court's 1977 announcement that there would no longer be a per se ban on taxation of interstate commerce. In fact, the last amendment to the Excise Tax Statute occurred in 1978, after the change in both federal statutory and judicial law that would have allowed taxation of out-of-state national banks, and no provision was then made for such taxation. Ala. Acts 1978, Special and Regular Sessions, Act No. 840, p. 1247. We do note, however, that a bill was introduced in the 1990 Regular Session of the Alabama legislature for the stated purpose of extending the Excise Tax Statute to out-of-state national banks, but it was not enacted. House Bill No. 944, Legislative Digest, Final Status p. 14 (May 3, 1990).
*972 "In the present case, we recognize that under existing federal law and judicial enlargement states are able to tax out-of-state national banks if their taxing measures are nondiscriminatory. See 12 U.S.C. § 548 (1988). However, when the Excise Tax Statute was enacted in 1935, federal law prevented taxation of out-of-state national banks. In addition to the changes implemented by Congress in 1976, the United States Supreme Court changed its position so as to allow taxation of interstate commerce. See Complete Auto Transit, Inc. v. Brady, supra.
"Under prevailing Alabama statutory construction law, we presume that the legislature was aware of the federal law in 1935 and of the subsequent changes in that law in 1976, as well as the changes in the United States Supreme Court's analysis of the taxation of interstate commerce. Ex parte Louisville & Nashville R.R., supra, and Ex parte Dixie Tool & Die Co., supra. Although the Alabama legislature presumably was aware of Congress's enlargement of state taxing power over national banks, and of the United States Supreme Court's enlargement in regard to taxation of interstate commerce, it made no changes to the Excise Tax Statute.
"This Court's role is not to displace the legislature by amending statutes to make them express what we think the legislature should have done. Nor is it this Court's role to assume the legislative prerogative to correct defective legislation or amend statutes. Consequently, we conclude that the Excise Tax Statute applies today in the same manner that it did when it was first enacted. Because states were prohibited from taxing out-of-state national banks at the time the statute levying the excise tax was first enacted and judicial interpretation disallowed taxation of interstate commerce, the State may not tax Chase, an out-of-state national bank, in the absence of additional action by the Alabama legislature."
This Court, in Ellis v. Pope, 709 So.2d 1161 (Ala.1997), reaffirmed Siegelman, Ex parte Dixie Tool & Die, and Ex parte Louisville & N.R.R., insofar as those cases require that we look to the original intent of the Legislature when interpreting a statute. In Pope, this Court adopted, as part of its opinion, a portion of the trial court's order, including this statement:
"The meaning of the term `district' appears to have varied over the years. Since the [1973] adoption of the present Judicial Article [of the Alabama Constitution], `district' [as in references to the district court] has come to mean a judicial subdivision of the State geographically equal to or less than a `circuit.' It usually coincides with county boundaries, and is never a subdivision of a county. The term must not be viewed in light of its meaning today, but as it was used in 1901, when Art. I, § 6, was drafted. Act No. 569, Acts of Alabama, 1907, which subdivided Coffee County, was adopted within six years of the ratification of our present Constitution, and that Act used the term `district' to refer to the subdivisions of the county. Therefore, it must be concluded that the term `district' in the terminology used at the time of the drafting and ratification of [the Alabama] Constitution in 1901 meant the subdivision of a county."
709 So.2d at 1165.
Section 6-5-60 provides:
"(a) Any person, firm, or corporation injured or damaged by an unlawful trust, combine or monopoly, or its effect, direct or indirect, may, in each instance of such injury or damage, recover the sum of $500 and all actual damages from any person, firm, or corporation creating, operating, aiding, or abetting such trust, combine, or monopoly and may commence the action therefor against any one or more of the parties to the trust, combine, or monopoly, or their attorneys, officers, or agents, who aid or abet such trust, combine, or monopoly. *973 All such actions may be prosecuted to final judgment against any one or more of the defendants thereto, notwithstanding there may be a dismissal, acquittal, verdict, or judgment in favor of one or more of the defendants.
"(b) Actions under this section may be commenced in any county where the trust, combine, or monopoly was formed or where it exists or is carried on, promoted, operated, practiced, employed, used, or enjoyed, or in any county in which either of the defendants may have a domicile or where an officer or agent of any defendant corporation may be found."
As the plaintiff correctly points out, § 6-5-60 is not, on its face, limited to transactions involving intrastate commerce. We hasten to add, however, that there is no language in § 6-5-60 that conclusively indicates an intent on the Legislature's part to regulate transactions involving the shipment of goods through interstate commerce. Because the language of § 6-5-60, standing alone, is not conclusive on the question of legislative intent, and because other factors, including the legislative history of Alabama's antitrust statutes, as well as the state of the law at the time of their enactment, cast doubt on the original intent of the Legislature, we find it necessary to look beyond the language of the statute.
"From this country's beginning there has been an abiding and widespread fear of the evils which flow from monopoly that is, the concentration of economic power in the hands of a few. By 1890, there was a vast accumulation of wealth in the hands of corporations and individuals, and an enormous development of corporate organization with the facility for combining into `trusts.' Units of traders and producers had snowballed by combining into trusts, and there was a widespread impression that the trusts had used and would use their power to oppress individuals and injure the public. Competition was threatened; price control was feared; and individual initiative was dampened.
"On the basis of these fears, Congress passed the Sherman Antitrust Act in July 1890 [15 U.S.C. § 1 et seq.], in order to prevent or suppress devices or practices which create monopolies or restrain trade or commerce by suppressing or restricting competition and obstructing the course of trade. It is designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. The basic objective of the Act, therefore, is the protection of competition and a competitive process that brings to consumers the benefits of lower prices, better products, and more efficient production methods. Thus, the purpose of the Act is not to protect businesses from the working of the market, but to protect the public from the failure of the market. The Act is not directed against conduct which is competitive, even severely so, but is directed against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns, but out of concern for the public interest."
54 Am.Jur.2d Monopolies, Restraints of Trade, and Unfair Trade Practices § 1 (1996).
Following the lead of other states, the Alabama Legislature enacted this state's first general antitrust law on February 7, 1891.[2] Ala. Acts 1890-91, Act No. 202, p. *974 438, entitled "An Act [t]o prohibit pools, trusts, or combines to regulate or control the prices of products, goods, wares or merchandise in this state," was patterned after a similar statute that had been enacted in Illinois and was akin to the Sherman Antitrust Act, which Congress had enacted shortly before on July 2, 1890. Act No. 202, which was criminal in nature, provided:
"Section 1. Be it enacted by the General Assembly of Alabama, That any person, corporation or association of persons who shall, within this state, engage or agree with other persons, corporations or association of persons, or enter into, either directly [sic], any combination, pool, trust or confederation to regulate or fix the price of any article or commodity to be sold within this state for speculation; and any person, corporation or association of persons who shall enter into, become a member of a party to, any pool, agreement, combination or confederation to fix or limit the amount or quantity of any article or commodity to be produced or manufactured, mined or sold in this state, shall be guilty of a misdemeanor, and subject to indictment and punishment as herein provided.
"Sec. 2. Be it further enacted, That it shall not be lawful for any corporation chartered under the laws of Alabama, or for any officer, stockholder, agent or employe of such corporation to enter into any combination with other persons or corporations, the purpose and effect of which are to place the management or control thereof in the hands of others, with the purpose or intent to limit or fix the price, or lessen the production or sale of any article of commerce, use or consumption, or to restrict or diminish the manufacture of such article.

*975 "Sec. 3. Be it further enacted, That any person or corporation violating the provisions of section one or two of this act, within the State of Alabama, shall, on conviction, be fined not less than five hundred dollars, nor more than two thousand dollars, at the discretion of the jury trying the same; and any officer, agent or employe of such corporation guilty of violating either of the two preceding sections of this act may be imprisoned, in addition to the fine, not less than six months, and not more than twelve months for every such offense: Provided, That nothing in this act shall prevent the producers of agricultural products from holding the same for higher prices; And provided further, That nothing in this act shall prevent the producer of any article of food or commerce from holding the same for higher prices, provided he does not combine or confederate with others thus to raise or lower prices.
"Sec. 4. Be it further enacted, That it shall be the duty of the circuit and city courts to give this act in special charge to the several grand juries of the state."
(Emphasis added.) Act No. 202 was codified in the Alabama Code of 1896 as Chapter 196, Article 5, § 5557, § 5558, and § 5559:
"5557. Forming pools or combinations to regulate the quantity or price of products.Any person or corporation, who engages or agrees with other persons or corporations, or enters into, directly or indirectly, any combination, pool, trust, or confederation, to regulate or fix the price of any article or commodity to be sold within this state for speculation, or any person or corporation who enters into, becomes a member of, or party to, any pool, agreement, combination, or confederation to fix or limit the quantity of any article or commodity to be produced, manufactured, mined, or sold in this state, must, on conviction, be fined not less than five hundred, nor more than two thousand dollars.
"5558. Combinations to control corporations with intent to fix the price or production of commodities. Any corporation chartered under the laws of this state, or any officer, stockholder, agent, or employe of any such corporation, which enters into any combination with any other corporation or person with the intent to place the management or control of any such corporation in the hands of another corporation or person and thereby limit or fix the price, or restrict or diminish the production, manufacture, sale, use, or consumption of any article of commerce, must, on conviction, be fined not less than five hundred, nor more than two thousand dollars.
"5559. Preceding two sections given in special charge to grand juries. The preceding two sections must be given in special charge to the grand jury."
What clearly stands out with respect to the 1896 codification of Act No. 202 is the change in phraseology in § 5557, specifically, the deletion of the words "within this state," which had appeared as the 20th, 21st, and 22d words of Act No. 202. This change was made by William L. Martin, Alabama's Code commissioner. Pursuant to Ala. Acts 1894-95, Act No. 507, § 1, p. 1001, Martin was given the authority to "revise, digest and codify all of the statutes of this state of a general and public nature, both civil and criminal." Act No. 507 specifically provided as follows:
"Sec. 3. Be it further enacted, That it shall be the duty of the said commissioner, at least three months before the meeting of the next general assembly to deliver said code to the governor of this state, together with a sworn statement, showing all the changes he shall have made in the phraseology of all the acts and laws codified by him, including additions thereto and omission therefrom, with accurate reference to the acts and laws so altered or changed; and it shall *976 be the duty of the governor carefully to examine the same, and to specifically report upon the same to the succeeding general assembly, recommending such alterations if any, as to him may seem proper; and attaching to his report the sworn statement of the commissioner herein provided for.
"Sec. 4. Be it further enacted, That said commissioner shall prepare appropriate chapters, titles, and subdivisions of titles for each chapter, clearly and briefly expressive of the subjects treated, which shall be arranged alphabetically, bringing into each chapter as near as may be, a condensation of all public laws, appertaining to the subject treated in each chapter: that said commissioner shall not simply transfer or transcribe the laws, but shall (without changing the sense) so alter the phraseology as to exclude all redundancy, or obscurity of expression, and where there shall be several acts relating to the same subject, they shall be condensed into one, and so expressed, as clearly to set forth the sense of the whole, having regard to judicial exposition thereof: that whenever it shall be apparent that there may be legislative omissions in any statute, said commissioner shall supply the same, so as to perfect such statute, and render its operation complete, and shall add all such original notes and references as shall be proper for the clear elucidation of them, and for easy reference to the several laws from which they may be compiled, showing as far as may be, when such acts and statutes become operative, when amended, with foot notes of all decisions of the supreme court, construing or mentioning such sections or acts, and as far as practicable, a brief and concise statement of the question decided by such decisions."
In his report to the Governor, on page 111, Martin stated as follows:
"CHAPTER 195. TRADE, PUBLIC POLICY AND POLICE.
". . . .
"5549, 5550, 5551. Based on the act of February 7, 1891page 438. To prohibit pools, trusts, etc. Re-written with such changes as were necessary in phraseology."
We note that Act No. 202, dealing with the prohibition of "pools, trusts, etc.," was codified as Article 5, § 5557, § 5558, and § 5559 of Chapter 196 of the 1896 Code, not as § 5549, § 5550, and § 5551, of Chapter 195. Notwithstanding these apparent errors, Martin did specifically state that he had rewritten "the act of February 7, 1891page 438" (Act No. 202) so as to make "such changes as were necessary in phraseology." Neither the Governor nor the Legislature made any changes to § 5557, § 5558, or § 5559 before the Legislature adopted the 1896 Code.
Article IV, § 103, of the Constitution of Alabama of 1901 provided:
"The legislature shall provide by law for the regulation, prohibition, or reasonable restraint of common carriers, partnerships, associations, trusts, monopolies, and combinations of capital, so as to prevent them or any of them from making scarce articles of necessity, trade, or commerce, or from increasing unreasonably the cost thereof to the consumer, or preventing reasonable competition in any calling, trade, or business."
This constitutional mandate, Rogers v. City of Mobile, 277 Ala. 261, 169 So.2d 282 (1964), resulted in the Legislature's readopting § 5557, § 5558, and § 5559 of the 1896 Code in substantially the same form in the 1907 Code as § 7579, § 7580, and § 7582:
"7579. (5557) Forming pools or combinations to regulate the quantity or price of products.Any person or corporation who engages or agrees with other persons or corporations, or enters into, directly or indirectly, any combination, pool, trust, or confederation, to regulate or fix the price of any article or commodity to be sold or produced within this state, or any person or corporation *977 who enters into, becomes a member of, or party to, any pool, agreement, combination, or confederation, to fix or limit the quantity of any article or commodity to be produced, manufactured, mined, or sold, in this state, must, on conviction, be fined not less than five hundred nor more than two thousand dollars.
"7580. (5558) Combinations to control corporations with intent to fix the price or production of commodities. Any corporation chartered under the laws of this state, or any officer, stockholder, agent, or employe of any such corporation, which enters into any combination with any other corporation or person with the intent to place the management or control of any such corporation in the hands of another corporation or person, and thereby limit or fix the price, restrict or diminish the production, manufacture, sale, use, or consumption of any article of commerce, must, on conviction, be fined not less than five hundred nor more than two thousand dollars.
". . . .
"7582. (5559) Four preceding sections given in special charge to grand juries.The four preceding sections must be given in special charge to the grand jury."
The Legislature also added the following provision, which appeared as § 7581 of Chapter 273 of the 1907 Code:
"7581. Monopolies, penalty for. Any person or corporation, domestic or foreign, which shall restrain or attempt to restrain the freedom of trade or production, or which shall monopolize or attempt to monopolize the production, control, or sale of any commodity, or the prosecution, management, or control of any kind, class, or description of business; or which shall destroy, or attempt to destroy, competition in the manufacture or sale of a commodity, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not less than five hundred nor more than two thousand dollars for each offense."
In addition to these criminal antitrust provisions, in the 1907 Code the Legislature, for the first time, provided for a civil cause of action for injuries resulting from the effects of a trust, combine, or monopoly:
"2487. Actions against trusts, combines, or monopolies.Any person, firm, or corporation injured or damaged by an unlawful trust, combine, or monopoly, or its effect, direct or indirect, may, in each instance of such injury or damage, recover the sum of five hundred dollars and all actual damages from any person, firm, or corporation creating, operating, aiding, or abetting such trust, combine, or monopoly; and may maintain the action therefor against any one or more of the parties to the trust, combine, or monopoly, or their attorneys, officers, or agents, who aid or abet such trust, combine, or monopoly. And all such actions may be prosecuted to final judgment or decree against any one or more of the defendants thereto, notwithstanding there may be a dismissal, acquittal, verdict, judgment, or decree in favor of one or more of the defendants.
"2488. County in which action brought.Actions under the preceding section may be brought in any county where the trust, combine, or monopoly was formed, or where it exists or is carried on, promoted, operated, practiced, employed, used, or enjoyed; or in any county in which either of the defendants may have a domicile, or where an officer or agent of any defendant corporation may be found."
Section 7579, § 7580, § 7581, and § 7582 of the 1907 Code were carried forward in substantially the same form into the 1923 Code as § 5212, § 5213, § 5214, and § 5215, respectively:
"5212. (7579) (5557) Forming pools or combinations to regulate the quantity or price of products.Any person or corporation who engages or agrees *978 with other persons or corporations, or enters into, directly or indirectly, any combination, pool, trust, or confederation, to regulate or fix the price of any article or commodity to be sold or produced within this state, or any person or corporation who enters into, becomes a member of, or party to, any pool agreement, combination, or confederation, to fix or limit the quantity of any article or commodity to be produced, manufactured, mined, or sold, in this state, must, on conviction, be fined not less than five hundred, nor more than two thousand dollars.
"5213. (7580) (5558) Combinations to control corporations with intent to fix the price or production of commodities. Any corporation chartered under the laws of this state, or any officer, stockholder, agent or employe of any such corporation, which enters into any combination with any other corporation or person with the intent to place the management or control of any such corporation in the hands of another corporation or person, and thereby limit or fix the price, restrict or diminish the production, manufacture, sale, use or consumption of any article of commerce, must, on conviction, be fined not less than five hundred nor more than two thousand dollars.
"5214. (7581) Monopolies, penalty for.Any person or corporation, domestic or foreign, which shall restrain or attempt to restrain the freedom of trade or production, or which shall monopolize or attempt to monopolize the production, control, or sale of any commodity, or the prosecution, management, or control of any kind, class, or description of business; or which shall destroy or attempt to destroy, competition in the manufacture or sale of a commodity, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not less than five hundred nor more than two thousand dollars for each offense.
"5215. (7582) Three preceding sections given in special charge to grand juries.The three preceding sections must be given in special charge to the grand jury."
Section 2487 and § 2488 of the 1907 Code (providing for a civil cause of action) were carried forward in substantially the same form into the 1923 Code as § 5697 and § 5698:
"5697. (2487) Actions against trusts, combines, or monopolies.Any person, firm, or corporation injured or damaged by an unlawful trust, combine, or monopoly, or its effect, direct or indirect, may, in each instance of such injury or damage, recover the sum of five hundred dollars and all actual damages from any person, firm, or corporation creating, operating, aiding, or abetting such trust, combine, or monopoly; and may maintain the action therefor against any one or more of the parties to the trust, combine, or monopoly, or their attorneys, officers, or agents, who aid or abet such trust, combine, or monopoly. And all such actions may be prosecuted to final judgment or decree against any one or more of the defendants thereto, notwithstanding there may be a dismissal, acquittal, verdict, judgment, or decree in favor of one or more of the defendants.
"5698. (2488) County in which action brought.Actions under the preceding section may be brought in any county where the trust, combine, or monopoly was formed, or where it exists or is carried on, promoted, operated, practiced, employed, used, or enjoyed; or in any county in which either of the defendants may have a domicile, or where an officer or agent of any defendant corporation may be found."
Section 5212, § 5213, and § 5214 of the 1923 Code were carried forward in substantially the same form into the 1940 Code as Title 57, § 106, § 107, and § 108, respectively:

*979 "§ 106. (5212) (7579) (5557) Forming pools or combinations to regulate the quantity or price of products. Any person or corporation who engages or agrees with other persons or corporations, or enters into, directly or indirectly, any combination, pool, trust, or confederation, to regulate or fix the price of any article or commodity to be sold or produced within this state, or any person or corporation who enters into, becomes a member of, or party to, any pool agreement, combination, or confederation, to fix or limit the quantity of any article or commodity to be produced, manufactured, mined, or sold, in this state, must, on conviction, be fined not less than five hundred, nor more than two thousand dollars.
"§ 107. (5213) (7580) (5558) Combinations to control corporations with intent to fix the price or production of commodities.Any corporation chartered under the laws of this state, or any officer, stockholder, agent or employee of any such corporation, which enters into any combination with any other corporation or person with the intent to place the management or control of any such corporation in the hands of another corporation or person, and thereby limit or fix the price, restrict or diminish the production, manufacture, sale, use or consumption of any article of commerce, must, on conviction, be fined not less than five hundred nor more than two thousand dollars.
"§ 108. (5214) (7581) Monopolies, penalty for.Any person or corporation, domestic or foreign, which shall restrain or attempt to restrain the freedom of trade or production, or which shall monopolize or attempt to monopolize the production, control, or sale of any commodity, or the prosecution, management, or control of any kind, class, or description of business; or which shall destroy or attempt to destroy, competition in the manufacture or sale of a commodity, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not less than five hundred nor more than two thousand dollars for each offense."
Section 5697 and § 5698 of the 1923 Code (providing for a civil cause of action) were carried forward in substantially the same form into the 1940 Code as Title 7, § 124 and § 125:
"§ 124. (5697) (2487) Actions against trusts, combines, or monopolies. Any person, firm, or corporation injured or damaged by an unlawful trust, combine, or monopoly, or its effect, direct or indirect, may, in each instance of such injury or damage, recover the sum of five hundred dollars and all actual damages from any person, firm, or corporation creating, operating, aiding, or abetting such trust, combine, or monopoly; and may maintain the action therefor against any one or more of the parties to the trust, combine, or monopoly, or their attorneys, officers, or agents, who aid or abet such trust, combine, or monopoly. And all such actions may be prosecuted to final judgment or decree against any one or more of the defendants thereto, notwithstanding there may be a dismissal, acquittal, verdict, judgment, or decree in favor of one or more of the defendants.
"§ 125. (5698) (2488) County in which action brought.Actions under the preceding section may be brought in any county where the trust, combine, or monopoly was formed, or where it exists or is carried on, promoted, operated, practiced, employed, used, or enjoyed; or in any county in which either of the defendants may have a domicile, or where an officer or agent of any defendant corporation may be found."
Section 106, § 107, and § 108 of Title 57 of the 1940 Code were carried forward in substantially the same form into the 1975 Code as § 8-10-1, § 8-10-2, and § 8-10-3, respectively:
"[§ 8-10-1] Any person or corporation who engages or agrees with other *980 persons or corporations or enters, directly or indirectly, into any combination, pool, trust, or confederation to regulate or fix the price of any article or commodity to be sold or produced within this state or any person or corporation who enters into, becomes a member of or party to any pool agreement, combination, or confederation to fix or limit the quantity of any article or commodity to be produced, manufactured, mined, or sold in this state must be fined, on conviction, not less than $500 nor more than $2,000."
"[§ 8-10-2] Any corporation chartered under the laws of this state or any officer, stockholder, agent, or employee of any such corporation which enters into any combination with any other corporation or person with the intent to place the management or control of any such corporation in the hands of another corporation or person and thereby limit or fix the price, restrict or diminish the production, manufacture, sale, use, or consumption of any article of commerce must be fined, on conviction, not less than $500 nor more than $2,000."
"[§ 8-10-3] Any person or corporation, domestic or foreign, which shall restrain, or attempt to restrain, the freedom of trade or production, or which shall monopolize, or attempt to monopolize, the production, control, or sale of any commodity or the prosecution, management, or control of any kind, class, or description of business or which shall destroy, or attempt to destroy, competition in the manufacture or sale of a commodity shall be guilty of a misdemeanor and, upon conviction, shall be fined not less than $500 nor more than $2,000 for each offense."
Section 124 and § 125 of Title 7 of the 1940 Code (providing for a civil cause of action) were carried forward in substantially the same form into the 1975 Code as subsections (a) and (b), respectively, of § 6-5-60.
With this legislative history in mind, we move next to the state of federal constitutional law at the time Alabama's antitrust statutes were originally enacted. In 1 ABA Antitrust Law Section, State Antitrust Practice and Statutes Introduction-20 (1990), we find the following:
"An important factor in most early state antitrust cases was the prevailing `dual sovereignty' theory of state-federal regulatory authority. This theory postulated distinct and mutually exclusive zones of jurisdiction for the states, which exercised jurisdiction only over purely intrastate matters, and the federal government, which exercised jurisdiction only over goods and services in interstate commerce."
(Emphasis in original.) See, also, Lawrence H. Tribe, American Constitutional Law, § 5-4, at 307-08 (2d ed.1988) (discussing the United States Supreme Court's varying approaches to interpreting the Commerce Clause, Article I, § 8, of the United States Constitution, but specifically noting the consistent dichotomy maintained by that Court between interstate commerce and intrastate commerce prior to the New Deal). This dichotomy between interstate commerce and intrastate commerce is clearly illustrated in a series of cases decided by the Court between 1888 and 1899. See Bowman v. Chicago & N.W. Ry., 125 U.S. 465, 493, 8 S.Ct. 689, 31 L.Ed. 700 (1888) ("[A] State has legislative control, exclusive of Congress, within its territory, of all persons, things, and transactions of strictly internal concern.... It cannot, without the consent of Congress, expressed or implied, regulate commerce between its people and those of the other States of the Union in order to effect its end, however desirable such a regulation might be."); Brennan v. Titusville, 153 U.S. 289, 302, 14 S.Ct. 829, 38 L.Ed. 719 (1894) ("we think it must be considered, in view of a long line of decisions, *981 that it is settled that nothing which is a direct burden upon interstate commerce can be imposed by the State without the assent of Congress"); United States v. E.C. Knight Co., 156 U.S. 1, 12, 15 S.Ct. 249, 39 L.Ed. 325 (1895) ("That which belongs to commerce [between the States] is within the jurisdiction of the United States, but that which does not belong to commerce is within the jurisdiction of the police power of the State."[3]); Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 233, 20 S.Ct. 96, 44 L.Ed. 136 (1899) (also involving an alleged violation of the *982 Sherman Antitrust Act) ("[e]ach state ... would have complete jurisdiction over the commerce which was wholly within its own borders, while the jurisdiction of Congress, under the provisions of the Constitution, over interstate commerce would be paramount, and would include therein jurisdiction over contracts [in restraint of such commerce]"); see, also, W.W. Thomas, A Treatise On Combinations In Restraint of Trade, § 90-91, at 229, 232 (2d ed. 1928) ("Congress has no control over intrastate commerce.... No state may in any way enact legislation which in any wise controls, regulates, or infringes on interstate commerce.").[4]
One of the best discussions of the prevailing dual-sovereignty theory of state-federal regulatory authority at the turn of the century is found in Justice Stewart's dissenting opinion in Cantor v. Detroit Edison Co., 428 U.S. 579, 632-36, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). In Cantor, the Supreme Court was called upon to decide whether Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), which had held that the Sherman Antitrust Act was not violated by state action displacing competition in the marketing of raisins, immunized private action that had been approved by a state regulatory agency and that had to continue while the state approval remained effective. Justice Stewart's historical analysis of the legislative history of the Sherman Antitrust Act, which was not in dispute, reads as follows:
"The floor debates and the House Report on the proposed legislation [the Sherman Antitrust Act] clearly reveal, as at least one commentator has noted, that `Congress fully understood the narrow scope given to the commerce clause' in 1890. This understanding is, in many ways, of historic interest only, because subsequent decisions of this Court have `permitted the reach of the Sherman Act to expand along with expanding notions of congressional power.' But the narrow view taken by the Members of Congress in 1890 remains relevant for the limited purpose of assessing their intention regarding the interaction of the Sherman Act and state economic regulation.
"The legislative history reveals very clearly that Congress' perception of the limitations of its power under the Commerce Clause was coupled with an intent *983 not to intrude upon the authority of the several States to regulate `domestic' commerce. As the House Report stated:
"`It will be observed that the provisions of the bill are carefully confined to such subjects of legislation as are clearly within the legislative authority of Congress.
"`No attempt is made to invade the legislative authority of the several States or even to occupy doubtful grounds. No system of laws can be devised by Congress alone which would effectually protect the people of the United States against the evils and oppression of trusts and monopolies. Congress has no authority to deal, generally, with the subject within the States, and the States have no authority to legislate in respect of commerce between the several States or with foreign nations.
"`It follows, therefore, that the legislative authority of Congress and that of the several States must be exerted to secure the suppression of restraints upon trade and monopolies. Whatever legislation Congress may enact on this subject, within the limits of its authority, will prove of little value unless the States shall supplement it by such auxiliary and proper legislation as may be within their legislative authority.'
"Similarly, the floor debates on the proposed legislation reveal an intent to `g[o] as far as the Constitution permits Congress to go,' in the words of Senator Sherman, conjoined with an intent not to `interfere with' state-law efforts to `prevent and control combinations within the limit of the State.' Far from demonstrating an intent to pre-empt state laws aimed at preventing or controlling combinations or monopolies, the legislative debates show that Congress' goal was to supplement such state efforts, themselves restricted to the geographic boundaries of the several States. As Senator Sherman stated: `Each State can deal with a combination within the State, but only the General Government can deal with combinations reaching not only the several States, but the commercial world. This bill does not include combinations within a State....' Indeed a preexisting body of state law forbidding combinations in restraint of trade provided the model for the federal Act. As Senator Sherman stated with respect to the proposed legislation: `It declares that certain contracts are against public policy, null and void. It does not announce a new principle of law, but applies old and well-recognized principles of the common law to the complicated jurisdiction of our State and Federal Government. Similar contracts in any State in the Union are now, by common or statute law, null and void.'
"It is noteworthy that the body of state jurisprudence which formed the model for the Sherman Act coexisted with state laws permitting regulated industries to operate under governmental control in the public interest. Indeed, state regulatory laws long antedated the passage of the Sherman Act and had, prior to its passage, been upheld by this Court against constitutional attack. Such laws were an integral part of state efforts to regulate competition to which Congress turned for guidance in barring restraints of interstate commerce, and it is clear that those laws were left undisturbed by the passage of the Sherman Act in 1890. For, as congressional spokesmen expressly stated, there was no intent to `interfere with' state laws regulating domestic commerce or `invade the legislative authority of the several States....'
"As previously noted, the intent of the draftsmen of the Sherman Act not to intrude on the sovereignty of the States was coupled with a full and precise understanding of the narrow scope of congressional power under the Commerce Clause, as it was then interpreted by *984 decisions of this Court. Subsequent decisions of the Court, however, have permitted the `jurisdictional' reach of the Sherman Act to expand along with an expanding view of the commerce power of Congress. See Hospital Building Co. v. Rex Hospital Trustees, 425 U.S. 738, 743 n. 2, [96 S.Ct. 1848, 48 L.Ed.2d 338,] and cases cited therein. These decisions, based on a determination that Congress intended to exercise all the power it possessed when it enacted the Sherman Act, have in effect allowed the Congress of 1890 the retroactive benefit of an enlarged judicial conception of the commerce power.
"It was this retroactive expansion of the jurisdictional reach of the Sherman Act that was in large part responsible for the advent of the Parker doctrine. Parker involved a program regulating the production of raisins within the State of California. Under the original understanding of the draftsmen of the Sherman Act, such in-state production, like in-state manufacturing, would not have been subject to the regulatory power of Congress under the Commerce Clause and thus not within the `jurisdictional' reach of the Sherman Act. See United States v. E.C. Knight Co., 156 U.S. 1[, 15 S.Ct. 249, 39 L.Ed. 325]. If the state of the law had remained static, the Parker problem would rarely, if ever, have arisen. As stated in Northern Securities Co. v. United States, 193 U.S. 197[, 24 S.Ct. 436, 48 L.Ed. 679], the operative premise would have been that the `Anti-Trust Act ... prescribe[d]... a rule for interstate and international commerce, (not for domestic commerce,)' id., at 337[, 24 S.Ct. 436]. The relevant question would have been whether the anticompetitive conduct required or permitted by the state statute was in restraint of domestic or interstate commerce. If the former, the conduct would have been beyond the reach of the Sherman Act; if the latter, the conduct would probably have violated the Sherman Act, regardless of contrary state law, on the theory that `[n]o State can, by ... any ... mode, project its authority into other States, and across the continent, so as to prevent Congress from exerting the power it possesses under the Constitution over interstate and international commerce, or ... to exempt its corporation engaged in interstate commerce from obedience to any rule lawfully established by Congress for such commerce.' Id., at 345-346[, 24 S.Ct. 436]."
428 U.S. at 632-36, 96 S.Ct. 3110 (Stewart, J., dissenting) (emphasis in Justice Stewart's opinion).
An Alabama appellate court first dealt with the scope of this state's antitrust statutes in 1913. In Georgia Fruit Exchange v. Turnipseed, supra, the defendant in a breach-of-contract action defended on the ground that the contract was illegal and void as in restraint of trade and against public policy. The Court of Appeals upheld the trial court's order sustaining the defendant's demurrer to the complaint, stating:
"Section 23 of our Constitution forbids the granting of exclusive and irrevocable special privileges and immunities by the Legislature, and section 103 thereof, which is a provision new to the Constitution of 1901, enjoins positively upon the Legislature the duty of providing by law for the `regulation, prohibition, or reasonable restraint of common carriers, partnerships, associations, trusts, monopolies, and combinations of capital, so as to prevent them or any of them from making scarce articles of necessity, or increasing unreasonably the costs thereof to the consumer, or preventing reasonable competition in any trade, calling or business.' In pursuance of this latter provision the Legislature of this state, following the lead of other states, has passed the act now embraced in sections 7579, 7580, and 7581 of the Code, patterned after a similar statute in Illinois and other states and akin to the federal statute, known as *985 the Sherman Anti-Trust Act of July 2, 1890, c. 647, 26 Stat. 209 (U.S.Comp.St. 1901, p. 3200).
"Said section 7579 of our Code thus provides: `Any person or corporation who engages or agrees with other persons or corporations, or enters into, directly or indirectly, any combination, pool, or trust, or confederation to regulate or fix the price of any article or commodity to be sold or produced within this state, or ... must, on conviction, be fined,' etc.
"Section 7581 reads: `Any person or corporation, domestic or foreign, which shall restrain or attempt to restrain the freedom of trade or production, or which shall monopolize or attempt to monopolize the production, control or sale of any commodity, or ... shall be fined,' etc.
"The Sherman Anti-Trust Act makes illegal, punishing the parties thereto by fine or imprisonment, `every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states or with foreign nations,' etc.
"There being thus both a state and national law prohibiting unlawful combinations in restraint of tradethe one law relating to intrastate, the other to interstate, commerceit is immaterial as to which character of commerce, whether only one or both, is involved in the contract here under consideration; for if the contract is in violation of either law it is void as contravening a positive statute; and, even if it does not go to the extent of being in actual violation of either statute, yet if it tends to create a monopoly by unreasonably restraining trade, it is still void under our law, as at common law, as being against public policy. Arnold v. Jones, 152 Ala. 501, 44 South. 662, 12 L.R.A. (N.S.) 150; 2 May. Dig. 784; 5 May. Dig. 218; 6 May. Dig. 182, where the authorities are cited."
9 Ala.App. at 131-33, 62 So. at 545-46. (Emphasis added.)
This Court first considered the application of Alabama's antitrust statutes in Dothan Oil Mill Co. v. Espy, supra. The defendants in that case were Alabama manufacturers of cotton-seed oil "in different localities in this state" and were "the only buyers in Alabama of any appreciable amount of cotton-seed offered for sale in the State." 220 Ala. at 606-07, 127 So. at 179-80. The plaintiffs, Alabama cotton ginners, alleged that the defendants had "agreed among themselves the price to be paid for cotton-seed throughout the State of Alabama." 220 Ala. at 606, 127 So. at 179. The defendants argued that the trial court lacked subject-matter jurisdiction, on the ground that the challenged conspiracy to control the price of cottonseed involved interstate commerce. The defendants based their argument on the fact that a portion of the products that were manufactured from cottonseed were sold outside Alabama. This Court rejected the defendants' argument, stating:
"We are not of [the] opinion, however, that the business of buying cotton seed, confined wholly to the state, to be crushed and manufactured into oil and other products, in such state, constitutes interstate commerce, within the scope and purpose of [the Federal Trade Commission Act] or within the sense of the Sherman and Clayton Acts (15 [U.S.C.] §§ 1-7, 15, and sections 12-27, 44) which confer on the federal courts exclusive jurisdiction to enforce said acts, though some of the manufactured products may eventually find their way into and become commodities of interstate commerce. `The fact, of itself, that an article when in the process of manufacture is intended for export to another state does not render it an article of interstate commerce.' Crescent Cotton Oil Co. v. State of Mississippi, 257 U.S. 129, 42 S.Ct. 42, 44, 66 L.Ed. 166; Coe v. Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715; New York Central R.R. Co. v. Mohney, 252 U.S. 152, 40 S.Ct. 287, 64 L.Ed. 502, 9 A.L.R. 496." *986 220 Ala. at 610, 127 So. at 182. Thus, the essence of this Court's decision in Espy was that the plaintiffs' complaint stated a state-law antitrust claim because the alleged illegal conduct involved only commercial transactions wholly confined to Alabama.
This Court next commented on Alabama's antitrust statutes in Ex parte Rice, supra. That case involved an original petition for a writ of mandamus to require the trial court to vacate its order overruling the plaintiffs' motion to compel answers to interrogatories. The underlying action was filed by the Sinclair Refining Company and sought the specific performance of a contract. The defendant raised as a defense that the contract was illegal, arguing that its "purpose was to engage in a monopoly in violation of the state and federal law." 259 Ala. at 572, 67 So.2d at 826. This Court denied mandamus relief, holding that the motion to compel had been properly denied because the interrogatories filed by the defendant sought to place an improper burden on the plaintiff. In the course of its discussion of the applicable law, this Court noted:
"We do not seem to have in Alabama a statute which defines an unlawful monopoly. Section 108, Title 57, Code, makes it a crime, punishable by fine, for any person, including a corporation, to restrain trade or create a monopoly. Section 103 of the Constitution requires legislation to prohibit monopolies and combinations. Section 78, Title 57, Code, makes lawful certain contracts fixing a minimum resale price. We have applied the common law, which is substantially as set out in the Sherman and Clayton Acts. See Sherrill v. Alabama Appliance Co., 240 Ala. 46(7), 197 So. 1.
"The federal statutes, Sherman and Clayton Acts, prescribe the terms of unlawful monopolies and restraints of trade as they should also be administered in Alabama. The question, therefore, is properly affected by those acts, and it must be controlled by them when the business involved in the suit affects interstate commerce. It is upon that basis that the foregoing conclusions prevail in this case."
259 Ala. at 575, 67 So.2d at 829. (Emphasis added.)
In San Ann Tobacco Co. v. Hamm, supra, this Court addressed the constitutionality of an amendment to the Alabama Unfair Cigarette Sales Act, Ala. Acts 1951, Act No. 805, as amended in 1965 by Ala. Acts 1965, Act No. 78, p. 105, Second Special Session. In striking down the amendment as violating § 1 and § 35 of the Alabama Constitution, this Court wrote:
"This Court held the original Act to be constitutional on its face, Simonetti, Inc. v. State ex rel. Gallion, 272 Ala. 398, 132 So.2d 252, and appellants do not attack that holding. But appellants do argue that one part of the 1965 amendment does render the Act unconstitutional on its face.
"The pertinent part of § 3(a) (Tit.57, § 83(3)) of the original Act provided:
"`It shall be unlawful for any wholesaler or retailer, with intent to injure competitors, destroy or substantially lessen competition, to advertise, offer to sell, or sell at wholesale or retail, cigarettes at less than cost to such wholesaler or retailer as the case may be.'
"This sentence was amended in 1965 and we emphasize the five additional words added which are pertinent to this decision:
"`It shall be unlawful for any wholesaler or retailer with intent to injure competitors, destroy or substantially lessen competition, or with the effect thereof, to advertise, offer to sell or sell at wholesale or retail cigarettes at less than cost to such wholesaler or retailer as the case may be....'
"We quote excerpts from the decision in Simonetti, Inc. v. State ex rel. Gallion, supra:

*987 "`"The present bill directly alleges a dual or cumulative specific intent to `injure competitors and destroy or substantially lessen competition' and that respondent's advertising, offers to sell, and sale of cigarettes at wholesale have been `at less than cost to said respondent.' These are considered to be allegations of ultimate, issuable facts, sufficient for the purpose of pleading, since the respondent's actual intent in fact, its costs, and its selling prices are presumably matters within its knowledge, and greater particularity would not seem to be required either to frame the issue or inform respondent of the charge against which it is required to defend. By these allegations, the State as complainant assumes a heavy burden of proof, since it must be proof of far more than mere intent of injury to competitors or `unfairness' of competition. It must also prove, under the construction placed upon the Act, a selling below cost with the specific intent of destroying or substantially lessening competition, since the Act, if valid at all, can only be held so as an exercise of the police power of the state over intrastate commerce to the end of inhibiting practices tending toward monopolization."'"
283 Ala. at 400, 217 So.2d at 804-05. (Some emphasis original; other emphasis added.)
At least three federal courts have followed the aforementioned line of Alabama decisions and have declined to interpret Alabama's antitrust statutes as reaching transactions involving interstate commerce. See In re Brand Name Prescription Drugs Antitrust Litigation, supra (district court denying motion to remand to state court, stating that "[i]t is clear that the statute [§ 6-5-60] applies only to intrastate activity");[5]In re NASDAQ *988 Market Makers Antitrust Litigation, supra, at 179 (denying motion to remand and noting that "the Alabama state courts have deemed the Alabama antitrust statutes upon which the complaint is based to regulate only intrastate commerce"); and Warren v. Playmobil U.S.A., Inc., supra (denying motion to remand, concluding that "the Alabama statutes the plaintiff purports to rely upon [§ 6-5-60, § 8-10-1, and § 8-10-3] regulate only intrastate commerce").
After carefully reviewing the record and the briefs (which, we note, were exceptionally well written), we conclude that the rationale of Siegelman (that because the states were prohibited by federal law from taxing out-of-state national banks at the time the statute levying the excise tax was first enacted, the state could not tax an out-of-state national bank under the existing tax statute in the absence of further action by the Legislature) is equally applicable in the present case. Although what is now § 6-5-60 (providing for a civil cause of action) was enacted a little over 16 years after what are now § 8-10-1, § 8-10-2, and § 8-10-3 (prescribing criminal penalties), all of these statutes are part of a uniform system of regulation, in the sense that they are all directed toward punishing or providing redress for activities in restraint of trade. Related statutes of this kind should, when possible, be construed in pari materia. Jordan v. Reliable Life Insurance Co., 589 So.2d 699 (Ala.1991), citing N. Singer, Sutherland Statutory Construction, § 70.05, at 505 (4th ed.1986). It is significant, we think, that all of these antitrust provisions were first enacted at a time in this country's history when the United States Supreme Court maintained a clear dichotomy with respect to a state's power to regulate commerce. Our research indicates that at the time of the enactment of what are now § 8-10-1, § 8-10-2, and § 8-10-3 (1891), and extending through the time of the enactment in 1907 of what is now § 6-5-60, the United States Supreme Court had clearly held that the regulation of interstate commerce was within the exclusive domain of Congress. It is also significant that a federal antitrust law (the Sherman Antitrust Act) was already in effect at the time of the enactment of what are now § 8-10-1, § 8-10-2, and § 8-10-3. Thus, under the rationale of Siegelman, we must entertain a strong presumption that the Alabama Legislature was aware toward the end of the 19th century and at the beginning of the 20th century, when it first enacted these antitrust statutes, that its ability to regulate antitrust activity was limited in that it did not have the power to directly regulate transactions involving interstate commerce. The United States Supreme Court had clearly signaled, however, that the regulation of intrastate commerce at the turn of the century was still largely within the exclusive domain of the states.
This presumption that the Legislature intended to limit the scope of its antitrust laws to transactions involving intrastate commerce is strengthened by several additional factors. First, the Illinois statute that formed the basis for what are now § 8-10-1, § 8-10-2, and § 8-10-3, was held early on by the Illinois Supreme Court to be limited to transactions involving intrastate commerce. See People ex rel. Akin v. Butler Street Foundry & Iron Co., 201 Ill. 236, 66 N.E. 349 (1903). Second, Act No. 202, § 1 (the predecessor of § 8-10-1), as originally enacted by the Legislature in 1891, read as follows:
"Section 1. Be it enacted by the General Assembly of Alabama, That any person, corporation or association of persons who shall, within this state, engage or agree with other persons, corporations or association of persons, or enter into, either directly [sic], any combination, *989 pool, trust or confederation to regulate or fix the price of any article or commodity to be sold within this state for speculation; and any person, corporation or association of persons who shall enter into, become a member of a party to, any pool, agreement, combination or confederation to fix or limit the amount or quantity of any article or commodity to be produced or manufactured, mined or sold in this state, shall be guilty of a misdemeanor, and subject to indictment and punishment as herein provided."
(Emphasis added.) Although this fact is certainly not conclusive, this section, as originally worded, suggests that the Legislature intended to limit the scope of Alabama's antitrust regulations to transactions involving intrastate commerce. Although the Code commissioner deleted the words "within this state" from § 5557 during his compilation of the 1896 Code, we find in our research no indication that he had the authority or the intent to make any substantive changes to Act No. 202, or that the Legislature, by adopting the 1896 Code with the commissioner's suggested change to § 5557, contemplated that the deletion of the words would effect the kind of substantive change that the plaintiff suggests was intendedto expand the scope of the statute to encompass transactions involving interstate commerce. We find it more probable (although we certainly can never know for sure) that the commissioner deleted the words, and that the Legislature accepted that change, out of an understanding or belief that the state lacked extraterritorial authority over commerce and, therefore, that the words were not necessary. Third, and perhaps most important, the Court of Appeals stated in 1913, shortly after these statutes were enacted, that the Legislature's regulatory power over antitrust violations did not extend to transactions involving interstate commerce, specifically recognizing that the regulation of such transactions had been undertaken by Congress pursuant to the Sherman Antitrust Act. The understanding of the Court of Appeals in this respect has been echoed by this Court on every occasion on which it has considered the matter. Fourth, the Legislature, with presumptive knowledge of the interpretation placed on Alabama's antitrust laws by Alabama appellate courts, has made no substantive changes to any of Alabama's antitrust laws since their original enactment.
As previously noted, when circumstances surrounding the enactment of laws, such as the antitrust statutes at issue here, cast doubt on the otherwise clear language of the statutes themselves, we must look to other factors in determining legislative intent. Siegelman, supra. In an effort to avoid indulging in conjecture or searching for imaginary purposes with respect to these antitrust statutes, we have followed the well-settled rule of statutory construction "that it is permissible in ascertaining [the purpose and intent of a statute] to look to the history of the times, the existing order of things, the state of the law when the instrument was adopted, and the conditions necessitating such adoption." In re Upshaw, 247 Ala. at 223, 23 So.2d at 863. Having done that, we hold, based on the above, that § 6-5-60 does not provide a cause of action for damages allegedly resulting from an agreement to control the price of goods shipped in interstate commerce. We reiterate what we stated in Siegelman, supra:
"This Court's role is not to displace the legislature by amending statutes to make them express what we think the legislature should have done. Nor is it this Court's role to assume the legislative prerogative to correct defective legislation or amend statutes."
575 So.2d at 1051. We hold only that the field of operation of Alabama's antitrust statutes, specifically § 6-5-60, is no greater today than it was when the laws were first enacted. Thus, these statutes regulate monopolistic activities that occur *990 "within this state"within the geographic boundaries of this stateeven if such activities fall within the scope of the Commerce Clause of the Constitution of the United States.[6] We leave to the Legislature the policy decision of whether to expand the reach of Alabama's antitrust statutes to activities that cross state boundaries.
The trial court's order denying the defendants' motion to dismiss is reversed, and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX, HOUSTON, SEE, and BROWN, JJ., concur.
COOK and JOHNSTONE, JJ., dissent.
LYONS, J., recuses himself.
SEE, J., files statement of nonrecusal.
COOK, Justice (dissenting).
I respectfully dissent, for the reasons expressed in my dissent in Abbott Laboratories v. Durrett, 746 So.2d 316, 340 (Ala. 1999).
JOHNSTONE, Justice (dissenting).
I respectfully dissent, for the reasons stated in my dissent in Abbott Laboratories v. Durrett, 746 So.2d 316, 347 (Ala. 1999).
SEE, Justice (statement of nonrecusal).
The plaintiff, Seven Up Bottling Company of Jasper, Inc. ("Seven Up"), through its attorney, has moved for my recusal in this case. Because, when I first considered the motion, I thought further information would be useful in resolving the recusal issue, the clerk of this Court sent my response to the recusal motion to counsel for all parties involved in this case. That response requested that the law firm of Walston, Wells, Anderson & Bains ("Walston Wells") provide me with the following information by way of affidavit:
(a) Mr. Larry Childs's interest in Walston Wells;
(b) the materiality of a particular client involved in this appeal, Archer Daniels Midland Company, to Walston Wells;
(c) the effect the result of this appeal will have on Walston Wells;
(d) the effect the result of this appeal will have on Mr. Childs's interest in Walston Wells;
(e) whether Mr. Childs will receive a commission, contingency fee, or bonus from this case, or from all of the firm's cases for a particular time period, that is dependent in any way on the outcome of this appeal;
(f) whether Mr. Childs will receive a compensation increase when the firm reaches a certain dollar amount of income in a given time period, and whether, and to what extent, the outcome of this appeal will affect the dollar amount of that income; and
(g) the number and identity of the cases Walston Wells currently has before this Court.
After making an in camera examination of the affidavits provided by Walston Wells, I have determined that Mr. Childs has no interest in Walston Wells that will be substantially affected by the outcome of this case.[7] Because Mr. Childs's interest will *991 not be substantially affected, and because there are no other grounds asserted for questioning my impartiality, it is my constitutional duty to decide this case. I, therefore, decline to recuse myself.

I.
Seven Up has moved for my recusal based on the fact that Larry Childs is my brother-in-law and is a partner in the law firm of Walston Wells, and the fact that Walston Wells is lead counsel for one of the defendants, Archer Daniels Midland Company ("ADM"). Mr. Childs did not appear as counsel. Nonetheless, because he is a partner in Walston Wells, it is possible to conceive of circumstances under which he might benefit to some degree from his firm's representation of one of the defendants. Therefore, I will address the concerns raised by Seven Up in its motion for my recusal.

II.
Seven Up argues that I am required to recuse on the basis that Mr. Childs's association with Walston Wells mandates my per se disqualification under the Canons of Judicial Ethics.[8] The defendants respond with the argument that I am not required to recuse, because Mr. Childs has no association with the case other than the fact that he is a partner in a law firm involved in the case. They argue that under Alabama law that circumstance alone does not require recusal.
"The law of recusal reflects two fundamental judicial policies: First, it is the *992 duty of a judge to decide cases.[[9]] Second, a judge should be a neutral, or impartial, decision-maker."[10]Dunlop Tire Corp. v. Allen, 725 So.2d 960, 976 (Ala. 1998) (See, J., statement of nonrecusal). The policies underpinning a judge's duty to vote on cases before him and a judge's duty to uphold the actual and apparent impartiality of the judiciary are embodied in Alabama's Canons of Judicial Ethics. Canon 3, Ala. Can. Jud. Eth. With respect to recusal, Canon 3C provides in pertinent part:
"(1) A judge should disqualify himself in a proceeding in which his disqualification is required by law[[11]] or his impartiality *993 might reasonably be questioned, including but not limited to instances where:
". . . .
"(d) He or his spouse, or a person within the fourth degree of relationship to either of them, or the spouse of such a person:
"(i) Is named a party to the proceeding, or an officer, director, or trustee of a party;
"(ii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;
"(iii) Is to the judge's knowledge likely to be a material witness in the proceeding."
There is no allegation that I have a personal bias for or against Seven Up. Mr. Childs is not a party to this proceeding; he is not an officer, a director, or a trustee of any party; and there is no indication that Mr. Childs is likely to be a material witness in the proceeding. Moreover, Mr. Childs does not himself represent any party in this case.[12]
Although the courts of Alabama have not addressed whether a judge must recuse himself because his relative is affiliated with a law firm that represents a party before him, the Commentary to Canon 3C(1)(d) states:
"The fact that a lawyer in a proceeding is affiliated with a law firm with which a lawyer-relative of the judge is affiliated does not of itself disqualify the judge. Under appropriate circumstances, the fact that `his impartiality might be reasonably questioned' under Canon 3C(1), or that the lawyer-relative is known by the judge to have an interest in the law firm that could be `substantially affected by the outcome of the proceedings' under Canon 3C(1)(d)(ii) may require his disqualification."
The Judicial Inquiry Commission has stated:
"[T]he mere fact that a lawyer representing a party to a proceeding `is affiliated with a law firm with which a lawyer-relative [of the judge] is affiliated' does not cause the judge's disqualification. It is thus the opinion of the Commission that the mere existence of the uncle's partnership interest is not a disqualifying factor."
Ala. Jud. Inquiry Comm'n Adv. Op. 88-338 (September 30, 1988).
"However, the judge is disqualified if other circumstances exist under which the judge's `impartiality might reasonably be questioned' (Canon 3C(1)), if she has a personal bias or prejudice concerning *994 a party as a result of the fact that a party is represented by this law firm (Canon 3C(1)(a)), or if the judge's sister-in-law is known by the judge to have an interest in the law firm that could be `substantially affected by the outcome of the proceeding.' Canon 3C(1)(d)(ii)."
Ala. Jud. Inquiry Comm'n Adv. Op. 97-653 (June 27, 1997).
The JIC has suggested a process for a judge to consider when he presides over a case in which a lawyer representing a party is affiliated with a law firm with which a lawyer relative of the judge is also affiliated:
"1.... [T]he judge should disclose the existence of the relationship to the parties and their attorneys even though the mere fact of the relationship is not a basis for disqualification....
"2. The judge must then determine whether there exist any factors, other than the relationship, which, in conjunction with the relationship, would cause the judge's impartiality to be reasonably questioned....
". . . .
"3. Finally, the judge should determine whether the lawyer-relative has an interest in the law firm that could be `substantially affected by the outcome of the proceedings' under Canon 3C(1)(d)(ii)....
"... [T]he judge is accountable only for those facts of which the judge has personal knowledge or of which he should have known.... A judge need not initiate investigation to determine whether or not his relative has an interest in the law firm that could be substantially affected by the outcome of the proceedings unless the judge has reason to believe that such an interest exists.
"... There are no precise and rigid formulas which may be applied in these circumstances. However, the good faith and conscientious application of the principles set out above should enable a judge to determine whether disqualification is required."
Ala. Jud. Inquiry Comm'n Adv. Op. 93-500 (August 31, 1993).
Richard Flamm has discussed that provision of the ABA Model Canons of Judicial Ethics that is substantially similar to Canon 3C(1)(d), Ala. Can. Jud. Eth. He explains:
"[C]ourts generally have reasoned that the mere fact that a judge's relative is somehow affiliated with a law firm representing a party in a proceeding pending before him does not constitute good cause for concluding that the judge is disqualified per se."
"It is generally agreed that when a case is being handled by an attorney other than a sitting judge's relative herself, the judge's impartiality may reasonably be questioned only when the judge's relative has an interest in the law firm that could be `substantially affected' by the outcome of the proceeding. However, determining whether a judge's attorney-relative possesses such an interest is not always simple.
"The interest of a judge's relative is most likely to be substantially affected by a judge's decision when that interest is a direct, pecuniary one; concerns of this nature are most likely to arise in circumstances in which judges are called on to make attorney fee awards, and the income of the judge's relative is somehow dependent on the nature of that award."[13]
*995 Richard E. Flamm, Judicial Disqualification: Recusal and Disqualification of Judges, §§ 8.5.3 and 8.5.4 (1996). Thus, Alabama's rejection of a per se recusal rule based on a lawyer relative's affiliation with a law firm is consistent with the general rule.
The United States Court of Appeals for the Second Circuit reasons that "[i]t would simply be unrealistic to assume ... that partners in today's law firms invariably `have an interest that could be substantially affected by the outcome of' any case in which any other partner is involved." Pashaian v. Eccelston Properties, Ltd., 88 F.3d 77, 83-84 (2d Cir.1996) (quoting 28 U.S.C. § 455(b)(5)(iii)).[14] In determining that recusal was not required in the case before it, the Second Circuit relied heavily on the fact that the trial judge, whose recusal was being sought, had considered, from information provided under seal, the gross revenue of his relative's law firm; the extent to which his relative, as a partner in the law firm, participated in the net income of the law firm; and whether his relative's interest in the firm would be "substantially affected" by the outcome of the specific case before the judge.[15] The Second Circuit determined that the trial judge's conclusion that his relative's interest would not be substantially affected "should not be ignored in favor of an unrealistic generalization that in our view is not supported, much less compelled, by the text of § 455(b)(5)(iii)." Id. at 84. Accord "Statement of Recusal Policy [of Seven Justices]," Supreme Court of the United States, November 1, 1993 ("We do not think it would serve the public interest to go beyond the requirements of the statute, and to recuse ourselves, out of an excess of caution, whenever a relative is a partner in the firm before us or acted as a lawyer at an earlier stage. Even one unnecessary recusal impairs the functioning of the Court. Given the size and number of today's national law firms, and the frequent appearance before us of many of them in a single case, recusal might become a common occurrence, and opportunities would be multiplied for `strategizing' recusals, that is, selecting law firms with an eye to producing the recusal of particular Justices."). Although it may be that some jurisdictions may automatically disqualify a judge from cases involving his brother-in-law's law firm,[16] it is the Second Circuit's *996 rationale that is consistent with the current state of Alabama law.[17]
In my review of this Court's cases, I have noted, for example, that two former Justices recused themselves from cases involving the law firm where their children were partners, but that when this Court, on July 31, 1998, initially issued an opinion in Abbott Laboratories v. Durrett (No. 1960464) (withdrawn this date on rehearing ex mero motu, and opinion substituted; see 746 So.2d 316), another Justice did not recuse under similar circumstances. The former situations involved a law firm with four partners and two lawyers of counsel. Thus, absent special provisions in the partnership agreement, any case could have a direct and substantial pecuniary impact on every partner. On the other hand, the law firm involved in the latter situation had *997 over 300 lawyers, with almost 100 partners in the office where the child practices.[18] The likelihood that a single case would have a substantial effect on the interest of a partner in such a firm is slight. Walston Wells is a law firm with 21 partners, 1 lawyer of counsel, and 10 associates. Although one could imagine situations where the interest of a partner of Walston Wells could be substantially affected by the outcome of a case, the information contained in the affidavits provided by Walston Wells establishes that no interest Mr. Childs has in Walston Wells will be substantially affected by the outcome of this case.
"[T]he Canon 3C(1) recusal test is: `Would a person of ordinary prudence in the judge's position knowing all the facts known to the judge find that there is a reasonable basis for questioning the judge's impartiality?'" Ala. Jud. Inquiry Comm'n Adv. Op. 93-500 (August 31, 1993) (quoting In re Sheffield, 465 So.2d 350, 356 (Ala.1984)). After examining the particular facts of this case, I am aware of no factors, other than the relationship, that might reasonably cause my impartiality to be questioned.[19]
Normally, a judge need not initiate an investigation into whether his lawyer relative has an interest that could be substantially affected by the outcome of a case before him. See Ala. Jud. Inquiry Comm'n Adv. Op. 93-500 (August 31, 1993) ("A judge need not initiate investigation to determine whether or not his relative has an interest in the law firm that could be substantially affected by the outcome of the proceedings unless the judge has reason to believe that such an interest exists."). However, because Seven Up has questioned whether the Canons of Judicial Ethics prohibit me from voting in this case, and because Mr. Childs is a partner in Walston Wells, I have investigated his interest in the firm, and whether the case before this Court will substantially affect that interest. After making an in camera examination of the affidavits provided by Walston Wells, I have determined that Mr. Childs has no interest in Walston Wells that will be substantially affected by the outcome of this case. Because no interest of Mr. Childs will be substantially affected, and because there are no other grounds asserted for questioning my impartiality, it is my constitutional duty to decide this case. I, therefore, decline to recuse myself.
HOOPER, C.J., and MADDOX, HOUSTON, KENNEDY,[20] COOK, BROWN, and JOHNSTONE, JJ., concur.
NOTES
[1] We note that in 54A Am.Jur.2d Monopolies, Restraints of Trade, and Unfair Trade Practices § 798 (1996), the following statement appears:

"A state antitrust act can have no extra-territorial operation; consequently, the courts in construing a state antitrust statute will generally apply it to trusts and combinations formed or operated within the state, even though its terms are broad enough to include combinations formed with parties residing outside the state."
But see the recent decision of the United States Court of Appeals for the Seventh Circuit in In re: Brand Name Prescription Drugs Antitrust Litigation, 123 F.3d 599 (7th Cir. 1997), citing R.E. Spriggs Co. v. Adolph Coors Co., 37 Cal.App.3d 653, 112 Cal.Rptr. 585 (1974), and Heath Consultants, Inc. v. Precision Instruments, Inc., 247 Neb. 267, 527 N.W.2d 596 (1995).
[2] The Legislature had enacted a law, approved on February 23, 1883, regulating the "pooling of freights":

"Section 1. Be it enacted by the General Assembly of Alabama, That it shall be unlawful for two or more railroad companies or persons operating railroads in this State to enter into any agreement among themselves, directly or indirectly, for the division among themselves of the freight carrying business at any station, town or city in this State, or into any pool arrangement among themselves of the nature and character aforesaid, the object, purpose and effect of which in either event shall be to prevent free and fair competition among said railroad companies or persons operating said railroads, for said freight carrying business, and to establish extortionate rates in favor of said companies or persons in doing said business, and which shall have the effect of being in undue restraint of the trade and business at any such station, town or city of this State.
"Sec. 2. Be it further enacted, That any officer, agent or servant of any such company, or person operating any railroad in this State who shall violate any of the provisions of this act, or who shall aid or assist in making or carrying out or performing any such agreement or pool arrangement shall be guilty of a misdemeanor and on conviction for every such offense shall be fined not less than fifty dollars, nor more than two hundred dollars, at the discretion of the court trying the same.
"Sec. 3. Be it further enacted, That it is the true intent and meaning of this act, that any such agreement, rates or pool agreement made by any convention or association of freight agents, or commissioner of freight rates or rate making committee outside of this State, but to be performed in whole or in part in this State, shall as to such part of the same, as is to be performed within this State, come within the provisions of this act.
"Sec. 4. Be it further enacted, That any agreement, rates, or pool arrangements made by two or more railroad companies, or persons operating railroads in this State, or by any convention, or by any association of freight agents or commissioner of freight rates, or rate making committee outside of this State, but to be performed in whole or in part within this State for the purpose of cheapening freight rates or of extending additional facilities to the public generally, or to any town, city or station in this State and which are not extortionate and in undue restraint of trade at any town, city, or station in this State, shall not be construed as coming within this act.
"Sec. 5. Be it further enacted, That if any such agreement, rate, or pool arrangement as is mentioned in the fourth section of this act shall have the certified approval of the railroad commission of Alabama, it shall be deemed as prima facie lawful and just in any proceeding before any court or officer of this State, and no officer, agent or servant of any railroad company, or person shall be liable to prosecution, for aiding or assisting in carrying out, or performing any such agreement or pool arrangement, so approved by any railroad commission of Alabama."
(Emphasis added.) Ala. Acts 1882-83, Act No. 79, p. 152-53. Section 2 of Act No. 79 was codified in the Alabama Code of 1886 as Article IV, § 4145.
[3] United States v. E.C. Knight Co. was the Supreme Court's first decision construing the Sherman Antitrust Act. The full text in which this quotation appears is as follows:

"It cannot be denied that the power of a State to protect the lives, health, and property of its citizens, and to preserve good order and the public morals, `the power to govern men and things within the limits of its dominion,' is a power originally and always belonging to the States, not surrendered by them to the general government, nor directly restrained by the Constitution of the United States, and essentially exclusive. The relief of the citizens of each State from the burden of monopoly and the evils resulting from the restraint of trade among such citizens was left with the States to deal with, and this court has recognized their possession of that power even to the extent of holding that an employment or business carried on by private individuals, when it becomes a matter of such public interest and importance as to create a common charge or burden upon the citizen; in other words, when it becomes a practical monopoly, to which the citizen is compelled to resort and by means of which a tribute can be exacted from the community, is subject to regulation by state legislative power. On the other hand, the power of Congress to regulate commerce among the several States is also exclusive. The Constitution does not provide that interstate commerce shall be free, but, by the grant of this exclusive power to regulate it, it was left free except as Congress might impose restraints. Therefore it has been determined that the failure of Congress to exercise this exclusive power in any case is an expression of its will that the subject shall be free from restrictions or impositions upon it by the several States, and if a law passed by a State in the exercise of its acknowledged powers comes into conflict with that will, the Congress and the State cannot occupy the position of equal opposing sovereignties, because the Constitution declares its supremacy and that of the laws passed in pursuance thereof; and that which is not supreme must yield to that which is supreme. `Commerce, undoubtedly, is traffic,' said Chief Justice Marshall, `but it is something more; it is intercourse. It describes the commercial intercourse between nations and parts of nations in all its branches, and is regulated by prescribing rules for carrying on that intercourse.' That which belongs to commerce is within the jurisdiction of the United States, but that which does not belong to commerce is within the jurisdiction of the police power of the State. Gibbons v. Ogden, 9 Wheat. 1, 189, 210, 6 L.Ed. 23; Brown v. Maryland, 12 Wheat. 419, 448, 6 L.Ed. 678; The License Cases, 5 How. 504, 599, 12 L.Ed. 256; [County of] Mobile v. Kimball, 102 U.S. 691, 26 L.Ed. 238; Bowman v. Chicago & N.W. Railway, 125 U.S. 465[, 8 S.Ct. 689, 31 L.Ed. 700]; Leisy v. Hardin, 135 U.S. 100, 10 S.Ct. 681, 34 L.Ed. 128; In re Rahrer, 140 U.S. 545, 555, 11 S.Ct. 865, 35 L.Ed. 572."
156 U.S. at 11-12, 15 S.Ct. 249.
In P. Areeda & D. Turner, 1 Antitrust Law, An Analysis of Antitrust Principles and their Application, § 232c (1978), we find the following discussion of Knight:
"The 1895 Knight case, the Supreme Court's first Sherman Act decision, held a national monopoly of sugar manufacturing beyond the constitutional reach of the act because mere manufacturing was not `commerce.' At that time, the Commerce Clause embraced only the actual and `direct' purchase, sale, or transportation of goods across state lines. The Court acknowledged that such commerce was affected by the sugar monopoly, but only `indirectly.'
"Two characteristics of the Knight decision remain important today. First, the Court never reached the merits of the government's case because the constitutional determination was made first, and the courts still treat the commerce question as a preliminary jurisdictional hurdle in antitrust litigation. Second, the jurisdictional inquiry was entirely independent of the Sherman Act's purposes. That separation seemed feasible in 1895 when `interstate commerce' was wholly dependent upon the location of the defendant's conduct, and without regard to its impact on the interests protected by the Sherman Act. This neat separation of jurisdictional and substantive inquiries caused difficulties with later and more expansive definitions of interstate commerce."
[4] We note that the Supreme Court had held at the time Alabama first enacted its antitrust statutes that the Commerce Clause, in conferring on Congress the power to regulate commerce, did not wholly withdraw from the states the power to regulate matters of local concern with respect to which Congress had not exercised its power, even though the regulation in some way affected interstate commerce. See, e.g., California v. Thompson, 313 U.S. 109, 113, 61 S.Ct. 930, 85 L.Ed. 1219 (1941), in which the Court noted:

"Ever since Willson v. Black Bird Creek Marsh Co., 2 Pet. 245, 7 L.Ed. 412 [(1829)], and Cooley v. [Board of Wardens of the Port of Philadelphia], 12 How. 299, 13 L.Ed. 996 [(1851)], it has been recognized that there are matters of local concern, the regulation of which unavoidably involves some regulation of interstate commerce, but which because of their local character and their number and diversity may never be adequately dealt with by Congress. Because of their local character, also, there is wide scope for local regulation without impairing the uniformity of control of the national commerce in matters of national concern and without materially obstructing the free flow of commerce which were the principal objects sought to be secured by the Commerce Clause. Notwithstanding the Commerce Clause, such regulation in the absence of Congressional action has, for the most part, been left to the states by the decisions of this Court, subject only to other applicable constitutional restraints."
See, also, South Carolina State Highway Department v. Barnwell Brothers, Inc., 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938); Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480 (1917); Bowman v. Chicago & N.W. Ry., supra, and the cases cited therein. There is nothing, however, in the Supreme Court's decisions in United States v. E.C. Knight Co., supra, and Addyston Pipe & Steel Co. v. United States, supra, that indicates that the Court would have viewed extraterritorial state antitrust provisions as falling within that constitutionally permissible category of local regulation having only an indirect or incidental effect on interstate commerce.
[5] The Court of Appeals for the Seventh Circuit reversed the district court's order denying the motion to remand. In doing so, the court recognized that at the turn of the century the Alabama Legislature lacked the constitutional authority to regulate interstate commerce through the use of antitrust provisions:

"The cases on which the defendants rely, for example, Georgia Fruit Exchange v. Turnipseed, 9 Ala.App. 123, 62 So. 542, 546 (1913), date from a period in which, interstate commerce being narrowly defined, see, e.g., Hadley Dean Plate Glass Co. v. Highland Glass Co., 143 Fed. 242, 244 (8th Cir.1906), and federal power to regulate such commerce being deemed exclusive, id.; United States v. E.C. Knight Co., 156 U.S. 1, 11, 15 S.Ct. 249, 253, 39 L.Ed. 325 (1895), a state statute limited to intrastate commerce would have some, albeit a strictly limited, scope and could not have a greater scope no matter how much the state wanted it to."
123 F.3d at 612-13. The court then went on to reason that "[t]he cases thus were not interpreting the statute; they were interpreting the Constitution as placing upper and lower bounds on the reach of the statute." 123 F.3d at 613. Stating that the United States Constitution "has since been reinterpreted," the court noted that "[o]ther states [have] read their antitrust statutes to reach what is now understood to be interstate commerce," and that "we are given no reason to suppose that Alabama would buck this trend." Id. This Court's decisions in Siegelman v. Chase Manhattan Bank, supra; Ex parte Dixie Tool & Die Co., supra; and Ex parte Louisville & N.R.R., supra, which created a presumption that the Legislature did not intend to exceed its constitutional authority in enacting this state's antitrust provisions, preclude the kind of statutory construction that the Seventh Circuit Court of Appeals thought we might engage in. As we have explained, this presumption was strengthened by, among other things, the extensive legislative history of the Alabama statutes that we have set out, including the critical limiting words contained in Act No. 202"within this state." The Seventh Circuit apparently ruled without the benefit of this legislative history or this Court's decisions referenced above. We also note that the Seventh Circuit expressed concern that "[i]f the statute is limited today as it once was to commerce that is not within the regulatory power of Congress under the commerce clause, it is a dead letter because there are virtually no sales, in Alabama or anywhere else in the United States, that are intrastate in that sense." 123 F.3d at 613. However, the statutes, as we interpret them, may yet have a field of operation because they continue to reach transactions within this state, in the geographic sense, even though such transactions may affect interstate commerce as currently defined by federal law. See Cantor v. Detroit Edison Co., 428 U.S. 579, 633, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) (Stewart, J., dissenting) (recognizing that when Congress passed the Sherman Antitrust Act, state efforts to restrain monopolies were "restricted to the geographic boundaries of the several states").
[6] Of course, Alabama's antitrust statutes may not be applied in a manner that discriminates against or unduly burdens interstate commerce. See Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981); Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).
[7] Because this case presents the same issues as Abbott Laboratories v. Durrett (No. 1960464), another case presently pending before this Court, I have also taken into account the effect the result of that case will have on Mr. Childs's interest in Walston Wells. I note that the plaintiffs in Durrett argue that my recusal decision should also take into account other cases not presently before this Court in which, they assert, Walston Wells is involved and which, they assert, may be affected by the outcome of this case. "[W]here a party seeks to create an artificial appearance of bias, ... recusal will generally not be required, because the duty of the judge to decide that case outweighs the appearance of partiality." Dunlop Tire Corp. v. Allen, 725 So.2d 960, 977 (Ala.1998) (See, J., statement of nonrecusal) (discussing whether a lawyer's threat to file a separate lawsuit against the judge creates an appearance of partiality). "To hold otherwise would allow a litigant to control judicial proceedings whenever a litigant becomes dissatisfied with the course of the proceedings." Id. A party cannot be permitted to "judge-shop" by seeking out information unknown to the judge, and then disclosing that information to the judge in order thereby to create an appearance of bias that will allow the party selectively to disqualify a judge the party believes will decide a case in a particular way. I will not recuse myself based on those cases not before this Court.
[8] Seven Up also maintains that my impartiality might reasonably be questioned by members of the public because I failed "to expressly disclose the existence of [my] relationship [to Mr. Childs] to Seven Up...." Seven Up cites an advisory opinion of the Judicial Inquiry Commission ("JIC") that states:

"In all ... cases in which a party is represented by a member of a law firm of which the judge's sister-in-law is a partner, the judge should disclose the existence of the relationship to the parties and their attorneys. The general rule is that `it is the judge's obligation to disclose all possibly disqualifying facts.'"
Ala. Jud. Inquiry Comm'n Adv. Op. 97-653 (June 27, 1997) (quoting J. Shaman et al., Judicial Conduct and Ethics, § 5.26 (1990)).
First, I have disclosed "Larry B. Childs, Esq., of Walston, Wells, Anderson & Bains Birmingham" continuously on my recusal list, filed with the Supreme Court clerk's office, since February 5, 1997, shortly after I assumed my position on this Court. Second, Canon 3D, which the JIC was interpreting, does not require disclosure in every instance in which the law firm of a lawyer relative is before the judge. Rather, it is the purpose of Canon 3D to permit a judge who is already disqualified by the terms of Canon 3C(1)(c) or Canon 3C(1)(d) to avoid withdrawing from the proceedings, through disclosure and consent of the parties and their attorneys. Cannon 3D provides:
"A judge disqualified by the terms of Canon 3C(1)(c) or Canon 3C(1)(d) may, instead of withdrawing from the proceeding, disclose in the record the basis of his disqualification. If based on such disclosure, the parties and lawyers, independently of the judge's participation, all agree in writing that the judge's relationship is immaterial or that his financial interest is insubstantial, the judge is no longer disqualified, and may participate in the proceeding. The agreement signed by all parties and lawyers shall be incorporated in the record of the proceeding."
Accordingly, the disclosure requirement imposed by the Canons of Judicial Ethics and discussed in the JIC opinion would not be effective until and unless the circumstances of the case otherwise required my recusal.
[9] I have written in a statement of nonrecusal:

"The Constitution of the United States and the Constitution of Alabama of 1901 impose on judges the duty to decide cases. See U.S. Const. Art. III, § 1 (vesting the `judicial Power of the United States ... in one supreme court, and in such inferior courts as the Congress may from time to time ordain and establish'); id. at art. VI (`[A]ll... judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution....'); Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 218-19, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (`Article III establishes a "judicial department" with the "province and duty" ... to decide "case[s]."') (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803) (emphasis added)); Marbury, 5 U.S. at 180 (stating that a judge's oath to support the Constitution requires that he exercise the judicial power and decide cases in a manner consistent with fundamental law); Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (`It is a judge's duty to decide all cases within his jurisdiction....'); Ala. Const.1901 amend. 328, § 6.01(a) (`[T]he judicial power of the state shall be vested exclusively in a unified judicial system which shall consist of a supreme court....'); id. at § 279 (requiring `all officers, executive and judicial, ... [to] take the following oath or affirmation: "I, _________, solemnly swear ... that I will support the Constitution of the United States, and the Constitution of the State of Alabama ... and that I will faithfully and honestly discharge the duties of the office upon which I am about to enter"`); Federated Guaranty Life Ins. Co. v. Bragg, 393 So.2d 1386, 1389 (Ala.1981) (`"[I]t is the duty of the judge to adjudicate the decisive issues involved in the controversy ... and to make binding declarations concerning such issues, thus putting the controversy to rest...."`) (citation omitted)."
Dunlop Tire Corp. v. Allen, 725 So.2d 960, 976 (Ala.1998) (See, J., statement of nonrecusal).
[10] I also wrote the following in my statement of nonrecusal in Dunlop:

"The Due Process Clauses of the Constitution of the United States and of the Alabama Constitution require that a judge be a neutral decision-maker. U.S. Const. amend. XIV, § 1 (`No State shall ... deprive any person of life, liberty, or property, without due process of law....'); Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust for Southern California, 508 U.S. 602, 617, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (`[D]ue process requires a "neutral and detached judge...."`); Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (examining due process ramifications of a state Justice's financial interest in the outcome of a case on which he had ruled); Stallworth v. City of Evergreen, 680 So.2d 229, 233-34 (Ala.) (`An unbiased and impartial decision-maker is one of the most, if not the most, fundamental ... requirements of fairness and due process.'), cert. denied, 519 U.S. 1007, 117 S.Ct. 509, 136 L.Ed.2d 399 (1996); Ala. Const.1901, § 6 (`[I]n all criminal prosecutions, the accused... shall not be ... deprived of life, liberty, or property, except by due process of law....'); id. at § 13 (`[E]very person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law....'); Ex parte Wilkey, 233 Ala. 375, 377, 172 So. 111, 113 (1937) (recognizing that §§ 6 and 13 of the Constitution of Alabama of 1901 require courts to be `impartial tribunals').
"Thus, the recusal law embodied in statutes, court decisions, and codes of ethics reflects both the duty to decide cases and the requirement of impartiality. See, e.g., 28 U.S.C. § 455 (requiring federal judges to recuse themselves from any proceeding in which their `impartiality might reasonably be questioned'); Ala.Code 1975, § 12-1-12 (prescribing general grounds for disqualification of Alabama judges from the trial of cases)."
Dunlop Tire Corp., 725 So.2d at 976 (See, J., statement of nonrecusal).
[11] Ala.Code 1975, § 12-1-12, states:

"No judge of any court shall sit in any case or proceeding in which he is interested or related to any party within the fourth degree of consanguinity or affinity or in which he has been of counsel or in which is called in question the validity of any judgment or judicial proceeding in which he was of counsel or the validity or construction of any instrument or paper prepared or signed by him as counsel or attorney, without the consent of the parties entered of record or put in writing if the court is not of record."
[12] Of course, if Mr. Childs did represent a party before this Court, my recusal would be required. Ala. Jud. Inquiry Comm'n Adv. Op. 97-653 (June 27, 1997) ("A judge is disqualified under Canon 3C(1)(d) in any proceeding in which an attorney is related to the judge within the fourth degree of consanguinity or affinity."). The Judicial Inquiry Commission has based that disqualification on Canon 3C(1)(d)(i):

"Canon 3C(1)(d)(i) provides that a judge is disqualified when, inter alia, a person within the fourth degree of relationship to the judge or his spouse is an officer, director, or trustee of a party. This provision has always been interpreted to require disqualification of a judge where a party's attorney is related to either the judge or the judge's spouse within the fourth degree, either by consanguinity or affinity."
Ala. Jud. Inquiry Comm'n Adv. Op. 97-637 (March 14, 1997). The JIC has also relied on Canon 3C(1)(d)(ii), which requires a judge to disqualify himself if "[h]e or his spouse, or a person within the fourth degree of relationship to either of them, ... [i]s known by the judge to have an interest that could be substantially affected by the outcome of the proceeding...." See Ala. Jud. Inquiry Comm'n Adv. Op. 89-356 (April 4, 1989).
[13] Flamm continues, pointing out that there is authority to the contrary:

"[A] number of courts and commentators have concluded that when the judge's relative is a partner in a firm appearing in a matter presently pending before him, judicial disqualification is mandated, but disqualification of the judge is not necessarily mandated when the judge's relative is merely an associate."
Richard E. Flamm, Judicial Disqualification: Recusal and Disqualification of Judges, § 8.5.5 (1996). He also notes:
"While judicial disqualification is sometimes sought on the ground that a party to a proceeding is a client of a judge-relative's firm, it is ordinarily insufficient to establish merely that the party is just any client; rather, it may be necessary to show that the client is a `material' client. The loss of a nonmaterial clientby definitionwould not `substantially affect' most law firms and, hence, would not substantially affect the interest of the judge's attorney-relative."
Id. at § 8.5.6.
[14] The statute quoted, 28 U.S.C. § 455(b)(5) (1976), requires that any justice, judge, magistrate, or referee "shall ... disqualify himself... [where] [h]e or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

"(i) Is a party to the proceeding, or an officer, director, or trustee of a party;
"(ii) Is acting as a lawyer in the proceeding;
"(iii) Is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding;
"(iv) Is to the judge's knowledge likely to be a material witness in the proceeding."
[15] The Second Circuit also noted that the judge

"[took] judicial notice of those matters that add to the reputation of major law firms in the City of New York and conclude[d] that insofar as the reputation of [the relative's law firm] is concerned, this matter is not of that significance to either add [to] or detract from its reputation in the City of New York...."
Pashaian, 88 F.3d at 84.
[16] The United States Court of Appeals for the old Fifth Circuit required recusal when a judge's relative was a partner in a law firm involved in a case pending before the judge. That court stated:

"We hold that when a partner in a law firm is related to a judge within the third degree, that partner will always be `known by the judge to have an interest that could be substantially affected by the outcome' of a proceeding involving the partner's law firm."
Potashnick v. Port City Constr. Co., 609 F.2d 1101, 1113 (5th Cir.1980) (basing its decision on 28 U.S.C. § 455(b)(5)(iii), which is identical to Canon 3C(1)(d)(ii), Ala. Can. Jud. Eth.).
On the other hand, the present Fifth Circuit has refused to apply this rationale to a claim that, because the judge's husband was a partner in a law firm that had represented a party on numerous occasions, the judge's impartiality was called into question. In re Billedeaux, 972 F.2d 104, 105-06 (5th Cir.1992) (finding the interest to be "too remote and speculative to support or suggest recusal"). In Billedeaux, the relative's law firm was not involved in the case then before the judge. The argument for recusal was that the law firm represented one of the parties before the judge on an ongoing basis and was receiving fees from those representations at the time the case was before the judge. Id.
The Second Circuit specifically rejected the rule of automatic recusal as set forth in Potashnick. Pashaian v. Eccelston Properties, Ltd., 88 F.3d 77 (2d Cir.1996).
[17] Finally, I note that although the United States Supreme Court has not issued an opinion resolving the conflict between the rationales of the Second and Fifth Circuits, seven Justices of that Court released a "Statement of Recusal Policy" on November 1, 1993. In that statement, the seven Justices set forth personal recusal policies that they would follow in certain circumstances. The Justices stated:

"A relative's partnership status, or participation in earlier stages of the litigation, is relevant ... only under one of two less specific provisions of § 455, which require recusal when the judge knows that the relative has `an interest that could be substantially affected by the outcome of the proceeding,' [28 U.S.C.] § 455(b)(5)(iii), or when for any reason the judge's `impartiality might reasonably be questioned,' § 455(a). We think that a relative's partnership in the firm appearing before us, or his or her previous work as a lawyer on a case that later comes before us, does not automatically trigger these provisions. If that were the intent of the law, the per se `lawyer-related recusal' requirement of § 455(b)(5)(ii) would have expressed it. Per se recusal for a relative's membership in the partnership appearing here, or for a relative's work on the case below, would render the limitation of § 455(b)(5)(ii) to personal work, and to present representation, meaningless."
"Statement of Recusal Policy," Supreme Court of the United States, November 1, 1993 (emphasis in original). Although the Justices are not automatically recused, they stated that they would personally recuse themselves from cases involving a law firm in which a relative is a partner who shares profits. The Justices explained:
"It seems to us that in virtually every case before us with retained counsel there exists a genuine possibility that success or failure will affect the amount of the fee, and hence a genuine possibility that the outcome will have a substantial effect upon each partner's compensation. Since it is impractical to assure ourselves of the absence of such consequences in each individual case, we shall recuse ourselves from all cases in which appearances on behalf of parties are made by firms in which our relatives are partners, unless we have received from the firm written assurance that income from Supreme Court litigation is, on a permanent basis, excluded from our relatives' partnership shares."
Id. Thus, although the seven Justices rejected a per se recusal policy like that set forth in Potashnick, 609 F.2d 1101 (5th Cir.1980), they decided, in the interest of practicality, that they would recuse themselves from all such cases unless they "received from the firm written assurance that income from Supreme Court litigation is, on a permanent basis, excluded from [their] relatives' partnership shares." "Statement of Recusal Policy," supra.
[18] It may also be that there is a difference in the nature of the fee arrangements. For example, contingent fees are dependent on the outcome of litigation, while noncontingent fixed or hourly fees are not.
[19] The JIC has listed the following as "other factors" to be considered:

"[W]hether the lawyer-relative would receive a commission, contingency, or bonus from the instant case, or all of the firm's cases for a time period; whether the relative would receive a salary increase when the firm reaches a certain dollar amount in a given time period; the degree of kinship between the judge and the relative; the number of cases the firm has before the judge; and any other connections, dealings or relationships of the judge to other members of the relative's law firm."
Ala. Jud. Inquiry Comm'n Adv. Op. 93-500 (August 31, 1993).
[20] Justice Kennedy's vote regarding the motion to recuse was made prior to his resignation on June 11, 1999.